IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

QUALITY COMPLIANCE  :
SERVICES, INC.,  :
 :
    Plaintiffs,  :
 :
vs.  :  1:05-CV-19 (WLS)
 :
DOUGHERTY COUNTY, GEORGIA  :
and CITY OF ALBANY, GEORGIA  :
 :
    Defendants  :
_____

## ORDER

Presently pending before the Court is Plaintiff's Quality Compliance Services, Inc. ("Quality Compliance") complaint for Declaratory Judgment. (Doc. 1). For the following reasons, Plaintiff's complaint for Declaratory Judgment (Doc. 1) is **DENIED.**

## FACTUAL BACKGROUND

Pursuant to the Georgia Comprehensive Solid Waste Management Act of 1990 (the "Act"), local governments within the State are required to adopt a Solid Waste Management Plan. Essentially, each Solid Waste Management Plan must lay out how waste will be managed, including waste reduction, collection, disposal and public awareness of waste management choices. See O.C.G.A. § 12-8-31. Accordingly, in 1993, Defendants adopted the Albany-Dougherty County Solid Waste Management Plan (the "Plan"). (Ex. 13.).

Under the Plan, the Defendants choose to continue utilizing the publically-owned Dougherty County Landfill (the "Landfill"), which required upgrading the Landfill to meet the requirements of Subtitle D of the federal Resource Conservation and Recovery Act (RCRA). The Plan also set out that funding for the Landfill, and for waste reduction and public awareness activities, would be generated by tipping fees charged for disposal of solid waste at the Landfill. As to collection of solid waste, the Defendants allocate the service to both private haulers and public

works employees, who in turn dispose of the solid waste at the Landfill.

In mid-2003, the Plaintiff began the process of obtaining the necessary permits and licenses to construct and operate a transfer station[1] in Dougherty County. Prior to operation, the Plaintiff also secured contracts with two primary customers, Onyx Waste and Hall-ing Refuse[2], whereby each customer would dispose of collected waste at Plaintiffs transfer station for a set price of $29.00 per ton. As part of its contract with Onyx Waste, Plaintiff would transport the waste disposed of by Onyx Waste from the transfer station to one of two landfills owned by Onyx Waste for a tipping price of $15.00 per ton. One of the two landfills was located out of state in Panama City, Florida, and charged a tipping fee of only $4.00 per ton during the four month "off-season." As part of its contract with Hall-ing Refuse, the Plaintiff would transport all solid waste disposed of at the transfer station, except for waste disposed of by Onyx Waste, to an in-state landfill owned by Hall-ing Refuse for a tipping price also of $15.00 per ton. Additionally, the Plaintiff acquired business from other third-party customers, such as local roofers and contractors.

Prior to the above contracts, Hall-ing Refuse was the largest customer of the Dougherty County Landfill, accounting for approximately one-third of all waste disposed of there. Upon receiving notice that Hall-ing Refuse would no longer dispose of waste at the landfill, the Defendants began assessing alternatives that would permit the Landfill to remain economically viable. As part of that assessment, the Defendants hired a consulting firm to perform an efficiency study of the Landfill and financial analysis of different alternatives. Essentially, the report projected that the Landfill's profits would continue to decrease under all alternatives, but the rate of decrease would be slowest if the Defendants required all solid waste generated in their respective jurisdictions to be disposed of at the Landfill. Thus, the "flow control" alternative would effectively regain Hall-ing Refuse as a customer by legislatively mandating that it dispose of the waste it

---

[1] Transfer stations are facilities where solid waste is unloaded from collection vehicles, stored and/or processed, and eventually transferred to permanent disposal facilities.

[2] Hall-ing Refuse is an entity affiliated with Allied Waste, a company owning landfills nationally and within the State. For simplicity, both Hall-ing Refuse and Allied Waste will collectively be referenced as "Hall-ing Refuse."

2

collects at the landfill.

Shortly thereafter, in August 2004, the Defendants passed the flow control legislation that the Plaintiff now challenges. Substantively the two ordinances are identical, except that one is applicable to Doughty County and the other to the City of Albany. In relevant part, the ordinances[3] state that:

> Any person, firm, partnership, corporation or other entity which transports, pursuant to a contract, whether oral or otherwise, Municipal Solid Waste generated within the [City or the] unincorporated portion of the County shall be required to deliver such Municipal Solid Waste to that certain landfill owned and operated by Dougherty County.
>
> Provided, however, that Municipal Solid Waste generated within the [City or the] unincorporated portion of the County and transported by person, firm, partnership, corporation, or other entity for disposal to a facility located outside of the State of Georgia shall be exempted from this requirement. Any such person, firm, partnership, corporation or other entity seeking an exemption under this provision shall submit a written waiver request to the [City/County] identifying the out of state location to which the Municipal Solid Waste is being transported, the length of time for which the waiver is being requested and any other pertinent information requested by the [City/County] during its processing of the waiver request. Failure on the part of any person, firm, partnership, corporation or other entity to obtain such waiver shall disqualify it from this exemption.

In December 2004, after receiving requests for information on obtaining the waiver to transport waste out of state[4], Defendants subsequently enacted a supplemental ordinance that addressed the specific guidelines used to determine whether a waiver should be granted. The supplemental ordinance basically requires submitting a waiver request and presenting information at a formal hearing. In making the determination of whether a waiver should be granted the ordinance states:

> Following the completion of the public hearing, the Board of Commissions of Dougherty shall approve or deny the request based upon its determination as to whether the public benefits, if any, derived from the request exceed any potential adverse effect that the approval would have upon the efficient and economical

---

[3]   The two ordinances are Dougherty County Ordinance 04-031 and City of Albany Ordinance 04-122. The Plaintiff points out that these two ordinances were originally enacted under the authority of O.C.G.A. 36-1-16, which was recently found unconstitutional under the Commerce Clause by the Georgia Supreme Court. See Fulton County v. City of Altanta, 280 Ga. 353, 629 S.E.2d 196 (2006). The statute was struck down because it granted counties the power to require express permission to both export *and* import waste. Here, the Ordinances do not require express permission to import waste  Consequently, the ruling bears no applicability to this case.

[4]   The Plaintiff has never submitted a waiver request in accordance with the ordinances. Evidence suggests, however, that such an attempt would have been futile.

3

operation of the County landfill.

As noted above, the ordinances are flow control legislation that direct all waste collected within Doughty County and the City of Albany to the Landfill, except that a waiver may be granted for waste transported out of the state. The primary purpose of the ordinances were to protect the long-term financial stability of the Landfill from all in-state, and, to an extent, out-of-state, competition to the local waste disposal market. More specifically, the ordinances caused Hall-ing Refuse to terminate its contract with the Plaintiff and instead deliver all waste collected to the Landfill.

Subsequent to the enactment of the above ordinances, on February 22, 2005, Plaintiff filed suit against the Defendants listing a number claims. With this Court's permission, the proceedings were bifurcated into two phases. Phase I of this litigation will solely address the Plaintiff's claim that Dougherty County Ordinance 04-031 and City of Albany Ordinance 04-122 violate the *Commerce Clause*.

## **DISCUSSION**

### **A. Dormant Commerce Clause**

The *Commerce Clause* provides that "Congress shall have Power ... to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art I, § 8, cl. 3. The Court has long interpreted the very existence of Congress' powers under the Commerce Clause to implicitly preclude the States from imposing excessive restrictions on that same power. See Dennis v Higgins, 498 U.S. 439, 447 (1991). This implicit Constitutional restriction upon the States has become known as the "dormant" or "negative" Commerce Clause doctrine. Further, the strictures of the dormant Commerce Clause are not limited to States, but also apply to counties within each State. Ft. Gratiot Sanitary Landfill, Inc. v. Michigan Dept of Natural Resources, 504 U.S. 353 (1992).

A two tier analysis is implemented to determine whether a statutory scheme violates the dormant *Commerce Clause*. City of Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978); Southern Waste Systems, LLC v. City of Delray Beach, 420 F.3d 1288, 1290 (11th Cir. 2005). Under the first tier, if the statute is found to discriminate against interstate commerce on its face, or

4

has the effect of discriminating against out-of-state interests to the benefit of in-state economic interests, the statute will generally be struck down as a *per se* constitutional violation. Id. But, even if the statute discriminates against interstate commerce, it will be upheld if it advances a legitimate local interest that can not be fulfilled by other reasonable nondiscriminatory alternatives. C & A Carbone, Inc. v. Clarkstown, 511 U.S. 383, 392 (1994). If the statute passes the per se analysis, it may nevertheless be found unconstitutional under the second tier of analysis. Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). Here, the question is whether the ordnance imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." Id.

1. Per Se Analysis

During the course of this litigation, the Supreme Court decided United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., 127 S. Ct. 1786 (2007), which has direct impact on this case. In United Haulers, the Court held that county flow control ordinances that required all waste be delivered to facilities owned and operated by a state-created *public* benefit corporation, and that treated all in-state and out-of-state private haulers the same, do not discriminate for purposes of dormant *Commerce Clause*. Id. at 1790. The facts in United Haulers were explicitly distinguished from the facts found in Carbone, which, in contrast to the former, involved a *private* business entity receiving the favored local benefits. 511 U.S. at 387. Thus, under this public-private distinction a state or municipality will not be subject to *per se* invalidity if the ordinance requires both local and out-of-state haulers to deliver all waste to a publically owned facility.

This Court finds United Haulers to be controlling precedent in the case at bar. There is no dispute that the Landfill is a publically-owned facility[5]. Further, the Ordinances do not favor in-state haulers. To the contrary, the Ordinances explicitly leave open the possibility of granting an exemption for waste being transported interstate, while leaving no such exemption for waste being transported intrastate. Consequently, the Ordinances do not discriminate against interstate commerce.

---

[5] Indeed, even in their post-trial brief the Plaintiffs do not contend the import of a public-private distinction, but only dispute whether a distinction should be made in the first instance. And that argument, of course, fails in light of the United Haulers decision.

5

2. Pike Balancing

a. Burdens to Interstate Commerce

Although the Ordinances do not overtly discriminate against interstate commerce they may still violate the Commerce Clause if their incidental burdens on interstate commerce outweigh their benefits conferred upon the locality. Pike, 397 U.S. at 142

To begin with, the only concrete incidental burden to interstate commerce reflected in the record is the solid waste that is no longer transported by the Plaintiff to Panama City, Florida for four months of the year. This burden, however, is insignificant relative to the cumulative tonnage of solid waste the Plaintiff transports. The Plaintiff maintained contracts with Hauling-Refuse, Onyx Waste, and other-third party customers; only the solid waste delivered by Onxy Waste, and for only four months of the year, could not be delivered to Panama City, Florida. Indeed, the Plaintiff even admits that a waiver exemption to transport the solid waste across state lines would not save their commercial venture. This is because they would still be prohibited from transporting waste across county lines to other in-state landfills–where the overwhelming majority of their solid waste was transported.

Apart from the solid waste transported to Florida, the only other burdens complained of by the Plaintiff are grounded in economic theory. Specifically, the Plaintiff's expert opined that if there were wide spread implementation of similar flow control legislation the national market for waste disposal would be "severely interfered" with. (Tr. p. 79.) Additionally, the Plaintiff's expert testified that if the Ordinances were restructured to restrict only the *intrastate* flow of solid waste a "potential constraint" on interstate commerce would still exist because it could deter the development of regional landfills. (Tr. p. 107.)

In addressing the Plaintiff's aggregation argument concerning burdens to interstate commerce three considerations bear mentioning. First, the law is clear that the analysis of burdens is to center exclusively on *interstate* burdens; thus, burdens that are local or intrastate in nature are irrelevant for *Commerce Clause* purposes in so far as they do not affect interstate commerce. See Southern Waste Systems, 420 F.3d at 1291; See also Ben Oehrleins & Sons & Daughter, Inc. v. Hennipin County, 115 F.3d 1372, 1385-86. Therefore, to the extent the Plaintiff stresses the

6

Ordinances' affects towards intrastate commerce, it is immaterial.

Second, in regards to any deterrent role the Ordinances may play in relation to stifling the development of regional landfills, whether caused by intrastate or interstate restrictions, the evidence and case law do not currently support such a broad proposition. In respect to evidence, the plaintiff's expert admitted he had zero empirical data to support such a claim. (Tr. p. 109.) Further, he knew of no specific instances where such an event had occurred. (Tr. p. 108.) While the Court can not say the theory is false, such a nebulous assertion should not be calculated on the side of interstate burdens.

In respect to precedent, twice the Supreme Court has had the opportunity to address arguments that local ordinances that prevent solid waste from being exported out of state or to other in-state counties, would, if adopted by many other jurisdictions, cause palpable burdens to interstate commerce. The first case to arise, Carbone, involved a flow control ordinance that required all haulers within the town to deliver waste to a particular private transfer station. 511 U.S. at 386. The majority opinion ultimately concluded the ordinance was facially discriminatory, and thus never reached a discussion of Pike analysis. Id. at 394. However, in concurrence, Justice O'Connor did reach a discussion of Pike analysis and reasoned that, "pervasive flow control would result in the type of balkanization the [Commerce] Clause is primarily intended to prevent." 511 U.S. at 406 (O'Connor, J., concurring). Within that context, O'Connor believed the ordinances imposed an excessive burden to the interstate flow of waste disposal when compared to the benefits conferred upon the town. Id.

The second case to arise, United Haulers, as noted earlier, involved an ordinance virtually identical to that in Carbone, except that the haulers were to deliver waste to a publicly-owned facility. Due to this public-private distinction the Court was subsequently able to reach a cursory, albeit important, discussion of the Pike balancing analysis. In affirming the Pike analysis performed by the court below, the Court noted, "The Second Circuit alluded to, but did not endorse, a 'rather abstract harm' that may exist because 'the Counties' flow control ordinances have removed the waste generated in Oneida and Herkimer Counties from the national marketplace for waste processing services.'" United Haulers, 127 S.Ct. at 1797. Importantly, the Court never rejected the

7

Second Circuits finding of only an "abstract" harm, which is quite telling given the Carbone concurrence had essentially argued the precise opposite. Id.

Third, if taken to its logical end the Plaintiff's aggregation argument would set problematic precedent. The Plaintiff strenuously argues that the impediments to interstate commerce include not only the waste disposal service that is defrayed from Florida, but also the theoretical implications to interstate commerce if similar ordinances were adopted nationally. The problem with this position, at least in the circumstances of the waste processing market, becomes evident if one considers it separated from the insignificant burden to Florida in this case. If accepted, the Plaintiff's argument would still warrant a balancing of an ordinance's benefits and burdens– burdens not born by the ordinance itself but, rather, from the possibility that similar ordinances in *other* jurisdictions would excessively burden interstate commerce. In light of local governments' historical role in the ambit of waste management, Southern Waste System, 420 F.3d at 1291, and their police powers from which the role is derived, such an argument is hardly tenable.

Still, the Plaintiff attempts to bolster its aggregation argument by pointing to two Eight Circuit cases. In U & I Sanitation v. City of Columbus, 205 F.3d 1063 (8th Cir. 2000), the town instituted an ordinance almost identical to the one at dispute here. There, the Plaintiff could no longer bring the waste it collected- which represented about 20% of all waste generated in the town and county- to an adjacent county that had lower tipping fees. Id. at 1066. Importantly, the adjacent county maintained one of three "Material Recovery Facilities" (facility that specializes in recycles) within the state. Id. The particular Material Recovery Facility would separate the recyclables from non-recyclables, and in turn sell the recyclables to other processors, including out-of-state processors. Id. Evidence showed that the direct affect of the ordinance would be to prevent 13-14% of the waste collected by the plaintiff from being recycled, and thus entering the interstate market. Id. at 1066-1067. Focusing on that 13-14% with an eye towards the market structure for recyclables, and on the affects of the ordinance if many or every jurisdiction adopted similar legislation, the Eight Circuit concluded the burdens to interstate commerce were clearly excessive in relation to the benefit conferred, which was revenue generation. Id. at 1069.

U & I Sanitation, however, is readily distinguishable from the case at bar. In that case, the

8

evidence concerning the structure of the market for recyclable materials, along with the affects of the ordinance upon the same, indicated a stronger nexus between the two than does the evidence in this case. Here, the evidence only shows, concretely, that the solid waste delivered to Panama City, Florida–for only four months of the year–would be potentially diverted from interstate commerce. Additionally, that would only affect waste collected by Onyx Waste, not Halling-Refuse or any of the third-party customers. Moreover, unlike <u>U & I Sanitation</u>, the Ordinances do not in any way vitiate the local or regional recycling programs. See id. at 1067. Perhaps noticing these incongruities, the Plaintiff also points to <u>Randy's Sanitation, Inc. v. Wright County</u>, 65 F. Supp. 2d 1017 (D. Minn. 1999), which does apply the aggregate analysis to the interstate market for waste processing services. To the extent Randy's Sanitation is still valid law post-<u>United Haulers</u>, it is not adopted for the reasoning discussed prior.

In sum, the only palpable burden on interstate commerce found in the record is the insignificant amount of service that will no longer be provided during four months of the year in Panama City, Florida.

### b. Benefits Conferred

The Defendants allegedly created the ordinances in order to accomplish the following goals: (1) to maintain the economic viability of the Doughty County Landfill; (2) to ensure the public health and safety of the citizens of Doughty County and the City of Albany through public control of the Landfill; (3) to limit later chain of title liabilities with respect to improper handling or disposal of solid waste; (4) to continue funding the public awareness and recycling programs that are funded by the Landfill's tipping fees; and (5) to increase efficiency in the collection of all municipal solid waste through consolidation of collection services in Doughty County and the City of Albany.

There is no doubt that revenue generation for the purpose of sustaining the economic viability of a publically-owned landfill is a legitimate benefit conferred to a locality. <u>United Haulers</u>, 127 S.Ct. at 1798. In regards to alleged benefits two through five, admittedly there is case

9

law that demonstrates possible alternatives[6]. However, when local legislation confers legitimate benefits, and the burden to instate commerce is insignificant, strict scrutiny of purported benefits is not compelled. See United Haulers Ass'n v. Oneida Herkimer Solid Waste Mgmt. Auth., 438 F.3d 150, 161 (2d Cir. 2006), *aff'd*, 127 S.Ct. 1786 (2007).

In striking the balance between benefits and burdens the decision in United Haulers once again deserves mention. The benefits in that case were arguably greater than those conferred by these Ordinances; in United Haulers, the benefits consisted not only of revenue generation but also enabling an integrated package of waste-disposal services that conferred health and environmental benefits through increased recycling. 127 S.Ct at 1798. But, that decision should not be read so myopically as to only condone flow control ordinances when they are introduced *ex ante* for safety concerns. Otherwise, localities–under the guise of their police powers–would often lose control over their preferred method of waste management if they failed to implement a scheme held to the court's standard. United Haulers clearly cautioned against such an approach in the realm of *Commerce Clause* jurisprudence. 127 S.Ct at 1798.

Undoubtedly this case is a borderline case. It is precisely for that reason, and for the reasons stated above, that the burdens to interstate commerce can not be seen as "clearly excessive" to the benefits conferred by the Ordinances. Accordingly, Plaintiff's complaint for declaratory judgement (Doc. 1) based on violations under the *Commerce Clause* is **DENIED.**

**SO ORDERED**, this __31st__ day of August, 2006.

                                                  /s/W. Louis Sands
                                                  **W. LOUIS SANDS, CHIEF JUDGE**
                                                  **UNITED STATES DISTRICT COURT**

---

[6] Carbone, 511 U.S 1690 (O'Connor, concurrance) (Stating, in respect to safety concerns, that they "could be achieved by simply requiring that all waste disposed of in the town be properly processed *somewhere*."); U & I Sanitation, 205 F.3d at 1071 (Stating the town could either raise taxes or increase licensing and permit fees to continue funding the landfill and recycling programs, and could enact uniform safety regulations to limit chain of title liabilities).